IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION



| | | |
|---|---|---|
| FRANK G. SILVA,<br>    Plaintiff, | §<br>§<br>§ | |
| v. | §<br>§ | EP-05-CA-0443-FM |
| MICHAEL CHERTOFF,<br>SECRETARY, DEPARTMENT<br>OF HOMELAND SECURITY,<br>    Defendant. | §<br>§<br>§<br>§ | |

**DEFENDANT'S MOTION TO DISMISS OR,**
**IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT**

COMES NOW, Michael Chertoff, Secretary, Department of Homeland Security, Defendant, by

and through the United States Attorney for the Western District of Texas, and pursuant to Rule 12 of the

Federal Rules of Civil Procedure, files this motion to dismiss or in the alternative, moves for summary

judgment pursuant to Rule 56, Federal Rules of Civil Procedure, and would respectfully show the Court

as follows:

## I.  STATEMENT OF FACTS

*See* Appendix for Statement of Facts, attached hereto as if fully incorporated herein.

## II.  BACKGROUND STATEMENT

This is a civil action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.

§ 2000e *et seq.*, the Age Discrimination in Employment Act of 1967, 29 U.S.C. 621, *et seq.*, as amended

("ADEA"), and the Rehabilitation Act, of 1973, as amended 29 U.S.C. § 791.  Title VII prohibits an

employer from failing or refusing to hire, promote, or discharge an individual "because of such

individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2(a)(1). Federal employees'

protections against race, gender and national origin discrimination are set forth in 42 U.S.C. § 2000e-16.

Federal employees' protections against disability discrimination are found in the Rehabilitation Act of

1973, as amended 29 U.S.C. § 791.  Similarly, the ADEA, 29 U.S.C. § 633a, is the exclusive and preemptive judicial remedy for age discrimination in federal employment.

Plaintiff, Frank Silva, has been employed by the federal government for approximately twenty years. In December, 1999, he began his employment as an Electronic Technician for the United States Border Patrol, at the El Paso Sector, stationed in Las Cruces, New Mexico.  The Las Cruces Shop consisted of Jerry Estep, Supervisor Electronic Technician, John Page, Electronic Technician, and Plaintiff.  The duties of an Electronic Technician include installing electronic devices on the mountain ranges and antenna on towers.  The electronic device is a sensor repeater positioned on mountain top ranges that sends signals to Border Patrol Station sensors and allow Border Patrol Agents to  identify the location of undocumented aliens.  An electronic technician must hike to remote mountaintops,  to diagnose, repair, or replace defective sensor equipment and must climb towers to diagnose, repair, or replace antenna equipment.  These are essential functions of the position of Electronic Technician within the Border Patrol.

On or about April 19, 2001, Plaintiff sustained an on-the-job injury during a climb to repair a sensor at Gillespie Peak.  He did not report the alleged injury until two months later on June, 2001.  The Office of Workers Compensation ("OWCP") accepted Plaintiff's claim of injury and Plaintiff began to receive benefits under the Federal Employees' Compensation Act ("FECA").  Plaintiff was out of work until July, 2001.  Upon his return, he was placed on "light duty" assignment until September 1, 2001, which was extended until November, 2001. However, in October, 2001, he  underwent arthroscopy surgery of the right knee. He was receiving workers' compensation benefits, thus, he was placed on leave without pay.   Plaintiff returned to work on April 17, 2002.

On May 9, 2002, Plaintiff was unable to climb a mountain, referred to as Hillsboro Peak, with Estep, another electronic technician, and two Border Patrol Agents. On May 15, 2002, Estep asked

Plaintiff what the agency could do to accommodate his inability to perform his duties as an Electronic Technician. Plaintiff responded that he should be allowed to take a helicopter instead of having to walk up the mountains. On that same day, Plaintiff filed an OWCP form, referred to as a CA-1, for the alleged injury that occurred on May 9, 2002. After the OWCP was filed on May 15, 2002, Plaintiff did not return to work.

On June 3, 2002, Plaintiff's treating physician noted that Plaintiff was able to return to work only with permanent restrictions consisting of walking for no more than 2 hours; lifting limit of 50 pounds for no more than two hours; limited kneeling and squatting to no more than 2 hours; and no climbing of mountains or towers, stairs, ladders or scaffolding. On September 3, 2002, Plaintiff's treating physician indicated that Plaintiff had restrictions of no sitting for more than 2 hours; no walking for more than 6 hours; no standing for longer than 6 hours; limited squatting to 1 hour and reiterated the permanent restriction of no climbing of mountains/towers. Dr. Westbrook noted that Plaintiff could do bench work where he can stand and move around occasionally.

On March 12, 2003, Dr. Arredondo performed an independent medical examination scheduled by the OWCP. He opined that Plaintiff could perform eight hours of work per workday under permanent restrictions of no climbing, no squatting for more than four hours, no walking for more than six hours, and additional restrictions placed on the amount of weight involved in using the leg to push, pull or lift. These restrictions still prevented Plaintiff from being able to perform the physical requirements of an Electronics Technician.

By correspondence dated June 20, 2003, Chief Border Patrol Agent Barker advised Plaintiff that the Agency did not have permanent light duty assignments. The Agency conducted a qualification review of Plaintiff's experience against vacant positions taking into consideration his physical limitations. Based on the job analysis, the Agency found that the only position available was that of

Law Enforcement Communications Officer ("LECA"). The LECA position was a GS 1802-5 with a noncompetitive promotional potential to the GS-8 level. The OWCP informed Plaintiff that it would offset in pay difference between the LECA position and his former position.   Plaintiff was offered the LECA position on three different occasions. He declined each time. The first time was on July 23, 2002 (date of the offer was June 20, 2002). No reason was given when he signed his declination, but his attending physician signed as a witness. The second time was on November 19, 2002 (date of the offer was November 5, 2002). His attending physician again signed as a witness. This time the declination was noted as being on "attending physician's advice." The third time was on June 30, 2003 (date of the offer was June 20, 2003). The reason given was that it was on "advice of his physician."

Chief Barker stated that the Agency denied Plaintiff's request for permanent light duty because there is no permanent light duty position available in the Electronic Branch. In addition, the permanent restrictions placed upon Plaintiff by his physician limited the Agency's ability to offer him work of any kind as an Electronics Technician. The Agency offered the LECA position on three occasions because the Agency wanted to make sure that Plaintiff would have the opportunity to remain gainfully employed. The situation was handled in the same way that they handled similar situations in the past involving other employees.

On August 28, 2003, Michael Moon, Deputy, issued a Proposal to Remove Plaintiff based on his inability to perform the full range of duties as a result of a medical condition. Plaintiff requested the option of filing for disability retirement. Chief Barker advised Silva that he would hold the removal in abeyance to afford him the opportunity to file for disability retirement in a timely manner. Plaintiff submitted his application for disability retirement to the Agency and to the Social Security Administration indicating that he could not perform the duties of an Electronic Technician. However, after numerous requests, Plaintiff failed to submit his attending physician's report substantiating his

request for disability retirement to the Agency.  Therefore, three years after Plaintiff's alleged injury of April 2001, CPA Barker issued a decision that Plaintiff's removal was warranted due to his inability to perform as a result of a medical condition. The removal was effective February 21, 2004.

On October 15, 2003, the OWCP advised Plaintiff that  his benefits under FECA would be terminated effective November 2, 2003 as a result of his refusal to accept suitable employment which was offered by the Agency.

According to Plaintiff, he was discriminated against because of his race (Mestizo/non-White), national origin (Mexican), age (52), physical disability (or perceived disability), and reprisal  when, on March 3, 2003, the Agency denied his request for an accommodation to transfer to a permanent light duty position in the Electronics Branch, El Paso Station.  He filed a second complaint indicating that he was discriminated against on the bases of national origin, physical disability (sprained knee and leg and medial meniscus), and, reprisal for filing the complaint on July 3, 2003 when he was terminated from his position as an Electronics Technician.

## III.  PLAINTIFF CANNOT ESTABLISH A *PRIMA FACIE* CASE OF DISCRIMINATION OR RETALIATION.

**A.       Plaintiff must prove a *prima facie* case.**

A plaintiff can prove a claim of intentional discrimination by either direct or circumstantial evidence.  *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000).  Absent direct evidence of discriminatory intent, proof via circumstantial evidence is assembled using the framework set forth in the seminal case of *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973).  *Russell*, 235 F.3d at 222(the  *McDonnell Douglas* framework applies to Title VII and ADEA claims).  As the Court has noted, "[t]he importance of *McDonnell Douglas* lies not in its specification of the discrete elements of proof that are required, but in its recognition of the general principle that any Title VII plaintiff must

5

carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion." *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 (1977).

Under the *McDonnell Douglas* test, the plaintiff first must establish a *prima facie* case of discrimination. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000). The burden then shifts to the employer to articulate a legitimate, non-discriminatory explanation for the challenged action. Once the employer satisfies this burden of production, the plaintiff must show that the employer's explanation is not the true reason, but is instead a pretext for illegal discrimination. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507 (1993). At all times, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains with the plaintiff. *Johnson v. Louisiana* , 351 F.3d 616, 621 (5th Cir. 2003).     Plaintiff offers no direct evidence of discrimination, but instead relies on allegations of disparate treatment to support his claims. As such, Plaintiff must satisfy the *McDonnell Douglas* test to establish his claim of discrimination.

**B.     Plaintiff Cannot Establish a *Prima Facie* Case under the Rehabilitation Act.**

**1.     Disability Discrimination/Failure to Accommodate.**

Plaintiff's claims of disability discrimination are governed by Section 504 of the Rehabilitation Act of 1973, as amended, which provides, in relevant part, that "no otherwise qualified individual with a disability in the United States, as defined in § 705(20), of this title, *solely by reason of* her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination . . ." 29 U.S.C. § 794(a) (emphasis added). A "qualified individual with a disability" means any person who has a physical or mental impairment which substantially limits one or more of such person's major life activities or which is regarded as having an impairment." 45 U.S.C. § 705(20). "Major life activities" means "functions, such as caring for one's self, performing manual tasks, walking,

seeing, hearing, speaking, breathing, learning, and working." *See Albertson's, Inc., v. Kirkingburg*, 527

U.S. 555, 119 (1999).   Whether an impairment is substantially limiting is determined in light of 1) the

nature and severity of the impairment; 2) its duration or expected duration; and 3) its permanent or

expected permanent or long-term impact. *Hamilton v. Southwestern Bell Telephone Co.*, 136 F.3d 1047,

(5th Cir.1998).

Plaintiff cannot establish a *prima facie* case under the Rehabilitation Act.   In a Rehabilitation

Act case, a plaintiff may establish a *prima facie* case by proving that (1) he was an "individual with a

handicap;" (2) he was "otherwise qualified;" (3) he was adversely treated solely because of his handicap;

and, (4) the plaintiff was treated less favorably than non-disabled employees. *Chandler v. City of Dallas*,

2 F.3d 1385, 1390 (5th Cir.1993);   *see also, Soledad v. U.S. Dept. of Treasury*, 304 F.3d 500, 505 (5th

Cir.2002).   The burden of proof for each of these elements lies with the plaintiff.   *Chandler*, 2 F.3d at

1390.[1]

As the summary judgment evidence clearly shows, Plaintiff was not prevented from doing major

life activities in his personal life or in his work.   In *Toyota*, the Court held "[w]hen addressing the major

life activity of performing manual tasks, the central inquiry must be whether the claimant is unable to

perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to

perform the tasks associated with her specific job." *Toyota Motor*, 534 U.S. at 200-201.   Merely having

an impairment does not make one disabled for purposes of the ADA.   *Toyota*, 534 U.S. at 195.   For this

reason, an impairment must not just limit or affect, but must substantially limit a major life activity.

*Waldrip v. General Electric Co.*, 325 F.3d. 652, 655 (5th Cir. 2003).

---

[1]The cases interpreting either the Rehabilitation Act or the Americans with Disabilities Act of 1990, 42 U.S.C. §§12101-12213 ("ADA"), which prohibits employment discrimination in the private sector, are binding on both private and federal sector disputes. *See Toyota Motor Manufacturing, Kentucky, Inc., v. Williams*, 524 U.S. 184 (2002).

Plaintiff testified that he takes care of his daily needs, such as dressing himself, he drives, and subsequent to his termination, he worked simulating war games for the Department of the Army. (*Exhibit 2, p. 6*). He had limitations in the amount of time he could kneel and he could not run. (*Id.* at pp. 69-70). During his employment with the Border Patrol, Plaintiff was also restricted from climbing towers and hiking mountains. However, those activities are not considered major life activities. *See Miller v. Airborne Exp.*, 1999 WL 47242 (N.D. Tex. 1999)("Miller's knee injury may substantially limit his ability to crawl, kneel, squat, or climb, this Court finds that those actions do not constitute major life activities); *Riojas v. Unicco Service Co.*, 2005 WL 589419, *3 (W.D. Tex. 2005) *citing Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 758 n. 2 (5th Cir.1996) (finding as a matter of law that climbing does not qualify as a major life activity under the ADA)

### 2.  Plaintiff's claim that he was "regarded as disabled."

Plaintiff did not allege administratively that he was mistakenly "regarded as disabled" by the Agency; thus, he is barred from raising it in his complaint. As a condition precedent to bringing a Title VII claim, a plaintiff must exhaust his available administrative remedies by pursuing the appropriate claim with the EEOC. *Tolbert v. United States*, 916 F.2d 245 (5th Cir. 1990). Once a Title VII complaint is filed, the scope of inquiry encompasses discrimination "like or related to" allegations contained in the EEOC charge and growing out of such allegations during the pendency of the case before the EEOC. *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455 (5th Cir. 1970). Courts have interpreted the "like or related to" language to permit claims that could reasonably be expected to grow out of the charge of discrimination. *Thomas v. Texas Dep't of Criminal Justice*, 220 F.3d 389 (5th Cir. 2000). Although it is not critical that a claimant assert all of his legal theories in his EEOC charge, he must assert the facts that are the bases for the legal claims. *Harris v. Parker College of Chiropractic*, 286 F.3d 790, 795 (5th Cir. 2002). Allowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumvent the EEOC's investigatory and conciliatory role, as well

as deprive the charged party of notice of the charges. *Clayton v. Rumsfeld*, 106 Fed.Appx. 268, 271 (5th Cir. 2004), *unpublished*. To decide whether a claim is exhausted, the court must determine whether the claimant has included sufficient facts in the EEOC charge to put the employer on notice that the employee might have additional allegations of discrimination. *Manning v. Chevron Chemical Co.*, 332 F.3d 874, 879 (5th Cir. 2003). *See Dollis v. Rubin*, 77 F.3d 777, 779-781 (5th Cir. 1995)(because plaintiff's EEOC charge alleged only failure to promote, court had no jurisdiction over other Title VII allegations, including hostile work environment, harassment, and disparate treatment).

In the instant case, Plaintiff claimed that the Agency discriminated when the Agency denied his request for reasonable accommodation because of his disability and when the Agency terminated him because of his disability (sprained knee and leg and medial meniscus tear). There was nothing to indicate that Plaintiff was alleging the Agency was mistakenly regarding him as disabled.

A discrimination complaint because of disability and "regarded as disabled" claims are analyzed differently under the law. As indicated above, to establish a claim of disability discrimination, the plaintiff must show (1) that the plaintiff has a disability; (2) that he is a qualified individual (i.e., one who is able to perform the essential functions of the job with or without reasonable accommodation); and (3) that the defendant discriminated against him because of the disability. To be "regarded as" having a disability under the ADA, a plaintiff must demonstrate that a covered entity (1) mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) mistakenly believes that an actual, non-limiting impairment substantially limits one or more major life activities. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999); *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 287 (5th Cir. 2004). It is not enough that the employer simply act because of some apparent impairment. Rather, the employer must "entertain mis-perceptions about the individual--it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting."

*Bray v. National Serv. Industries, Inc.*, 209 F. Supp.2d 1343, 1350 (M.D. Ga. 2001);  *Green v. National*

*Steel Corp., Midwest Div.*, 197 F.3d 894, 898 (7th Cir. 1999).  Therefore, the two claims are not like or

reasonably related to one another.  *See, e.g., Marshall v. Federal Express Corp.*, 130 F.3d 1095, 1098

(D.C. Cir.1997)(failure to accommodate claim barred where plaintiff filed an EEOC charge alleging

failure to promote based on a disability but made no mention of a failure to accommodate).  Plaintiff's

claim of "regarded as" discrimination should be dismissed for failure to exhaust.

Even if the Court finds that Plaintiff exhausted this claim administratively, Plaintiff fails as a

matter of law to establish a claim for "regarded as disabled."  Plaintiff fails to provide any evidence that

Defendant mis-perceived the status of his injuries such that he was viewed as having a covered disability.

On the contrary, Plaintiff informed Defendant that he would have to work under certain restrictions and

that these restrictions were permanent. "Where a 'defendant's recognition of plaintiff's limitations was

not an erroneous perception, but instead was a recognition of a fact,' " it would be inappropriate to find

that such a plaintiff has been regarded as disabled under the ADA.  *Hilburn v. Murata Elecs. N. Am.,*

*Inc.*, 181 F.3d 1220, 1230 (11th Cir.1999). Plaintiff points to no evidence to show that Defendant acted

on any information or perceptions other than those limitations that he brought to the Agency's attention.

Further, the Agency offered Plaintiff the LECA position and believed Plaintiff could perform other jobs.

*See Dupre v. Charter Behavioral Health Systems of Lafayette, Inc.,* 242 F.3d 610, 616 (5th Cir. 2001).

Even if viewed in a light most favorable to Plaintiff, the evidence before this Court could not persuade

any reasonable jury to conclude that Plaintiff was "regarded as" disabled.

3.      **Plaintiff Was Not a "Qualified Individual" Under the Act**.

Even assuming Plaintiff did qualify as "disabled," either by the substantially limiting nature of

his impairment or being "regarded as" disabled by Defendant, Plaintiff's claim would still fail because

he does not establish that he is a "qualified individual" within the meaning of the Act.  Plaintiff  could

not perform the essential functions of his job. A plaintiff must establish that he can perform the essential functions of the position, with or without reasonable accommodation. "This determination is to be made at the time of the employment decision." *Gaul v. Lucent Technologies, Inc.*, 134 F.3d 576, 580 (3d Cir.1998). "In determining what constitutes the essential functions of a position, 'consideration shall be given to the employer's judgment as to what functions of a job are essential....' " *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 486 (5th Cir.2001).

Plaintiff acknowledged that he was expected to climb towers and hike mountains as part of his job as an Electronic Technician. The Position Description for electronic technicians stated that "work is usually performed in the Electronic shop (climate controlled) and at remote sites (i.e., top of mountains, towers and other outlying areas). May be exposed to potentially hazardous situations (e.g., electrical shock, falls) as well as extreme weather conditions (rain, snow, ice, high winds, extreme temperatures)." Plaintiff's treating physician reported that Plaintiff was permanently restricted from climbing towers and mountains. Dr. Arredondo reported that it would be a danger to Plaintiff and to others to allow him to climb towers and mountains.

The Rehabilitation Act does not require an employer to relieve an employee of the essential functions of the job, modify those duties, reassign existing employees to perform those duties, or hire new employees to do so. *Burch v. City of Nacodoches*, 174 F.3d 615, 620-21 (5th Cir.1999). The Fifth Circuit has observed that, if the only successful accommodation is for the disabled individual not to perform the essential functions of the job, then the plaintiff cannot be reasonably accommodated. *Id.*

Plaintiff requested a transfer to a permanent light duty assignment, where he could do bench work, as a "reasonable accommodation" to his disability. "Reasonable accommodation is an element of a prima facie case of discrimination, and [the plaintiff] thus bears the burden of proof of reasonableness." *Riel v. Elec. Data Sys. Corp.*, 99 F.3d 678, 683 (5th Cir.1996).

Based on the undisputed evidence in the summary judgment record, the climbing of towers and hiking mountains were essential to an Electrical Technician's job at the Agency. An employer is not required to reassign a disabled employee to an occupied position or create a new position to accommodate that employee. *See Vitale v. Ga. Gulf Corp.*, 82 Fed. Appx. 873, 875 (5th Cir.2003) Further, changing an employee from a laborer to a 'light-duty' worker is not a reasonable accommodation to assist in the performance of his job; it is a completely different job. *Johnson v. City of Port Arthur*, 892 F. Supp. 835, 842 (E.D. Tex.1995). *See Turco  v. Hoechst Celanese Corp*, 101 F.3d 1090, 1094 (5th Cir. 1996)(an employer is not required to create light-duty jobs to accommodate disabled employees); *Magnant v. Panelmatic Texas, Inc.*, 2006 WL 2434475, *10 (S.D. Tex.).

According to Dr. Arredondo, Plaintiff could not climb towers because it would be a danger to himself and others. To allow Plaintiff to continue with the essential duties of the position of Electronic Technician would pose a significant risk to the health or safety of others that could not  be eliminated by reasonable accommodation. *See* 42 U.S.C. § 12111(3)(1).  As a result, even though Plaintiff was not considered disabled, the Agency conducted a job analysis to attempt to keep the Plaintiff gainfully employed. On three occasions, the Agency offered Plaintiff the LECA position. This position was the only one that Plaintiff was qualified for and in which the Agency would be able to meet Plaintiff's physical restrictions. At one point, during a meeting with the Plaintiff as part of the reasonable accommodation process and to discuss Plaintiff's options, Plaintiff stated that his physician had cleared him to climb (this was the restriction that prevented management from returning Plaintiff to his original position). The LMR specialist asked for written confirmation from the physician of his capability. Plaintiff stated that he would obtain the necessary documents. After the telephone conference, the Plaintiff contacted the EEO counselor and admitted he lied during the meeting to get out of the room.

12

Further, although Plaintiff now alleges he could perform the essential functions of his job, at the time of his termination, he acknowledged he could not perform the essential functions of his job. He applied for disability retirement and for disability benefits under the Social Security Administration. In the "Applicant's Statement of Disability," Plaintiff stated that he could not perform the duties of his job because "strainious [sic] or vigorous physical activity causes severe pain and swelling of anterior and posterior knee with cramping of lower leg and back spasms." Plaintiff indicated that the agency had offered him a job sitting on a console with an eight foot cord and a headset but his knee still got swollen. At the same time, Plaintiff applied with the Social Security Administration for disability benefits. The application was signed under penalty of perjury. In 2005, the Veterans Administration denied Plaintiff's application of unemployability. Plaintiff, therefore, acknowledged that he could not perform the essential functions of his job with or without an accommodation. *Cleveland v. Policy Management Systems*, 119 S. Ct. 1597 (1999).

Additionally, as elaborated below, Plaintiff cannot establish that he was adversely affected or that he was treated less favorably than non-disabled employees.

**C.     Plaintiff Cannot Establish a *Prima Facie* Case of Discrimination Regarding the Denial of the Transfer or the Termination of Employment.**

To establish a *prima facie* case of disparate treatment, a plaintiff must show that (1) he is a member of a protected class;(2) he is qualified for the position; (3) he suffered an adverse employment action; and (4) others outside the class who were similarly situated were treated more favorably than him. *Okoye v. University of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512-13 (5th Cir.2001).

An adverse action requires an ultimate employment decision such as hiring, granting leave, discharging, compensating or promoting. *See Pegram*, 361 F.3d at 282; *Foley v. Univ. of Houston Sys.*, 355 F.3d 333, 341 (5th Cir. 2003). Plaintiff cannot establish a *prima facie* case because he cannot show that he suffered an adverse action regarding the transfer to permanent light duty assignment. Moreover,

13

regarding both the denial of transfer and the termination,  he cannot show that others outside his protected class, who were similarly situated, were treated more favorably.

An action that affects the "compensation, terms, conditions, or privileges of employment" is generally referred to as an "adverse employment action" and is required to be shown as part of the plaintiff's *prima facie* case of employment discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802; *Young v. City of Houston*, 906 F.2d 177, 182 (5th Cir. 1990). The Fifth Circuit has a strict interpretation of the adverse employment element of a plaintiff's *prima facie* intentional discrimination case.  Under Title VII principles, an employment action that does not affect job duties, compensation, or benefits is not an adverse employment action. *Pegram*, 361 F.3d at 282, *citing, Banks v. East Baton Rouge Parish Sch. Bd.*, 320 F.3d 570, 575 (5th Cir. 2003).  Rather, an adverse employment action consists of *ultimate employment decisions* such as hiring, granting leave, discharging, promoting, and compensating. *Id., emphasis in the original, citing Felton v. Polles,* 315 F.3d 470, 486 (5th Cir. 2002).  A tangible employment action constitutes a significant change in employment status and in most cases inflicts direct economic harm. *Zaffuto v. City of Hammond*, 308 F.3d 485, 493 (5th Cir. 2002).

Refusing an employee's request for a  purely lateral transfer (a transfer that does not involve a demotion of form or substance) does not qualify as an ultimate employment decision. *Pegram,* at 282 (citing  *Banks v. East Baton Rouge Parish Sch. Bd.*, 320 F.3d 570 (5th Cir. 2003)); *Burger v. Central Apartment Mgmt., Inc.,* 168 F.3d 875, 879 (5th Cir. 1999); *McFall v. Gonzales*, 143 Fed. Appx. 604 (5th Cir. 2005), *unpublished*.   Moreover, a refusal to transfer may be arguably less intrusive than an involuntary relocation. *Burger*, 168 F.3d at  879.

In the instant case, Plaintiff's request to be  transferred from the Las Cruces station to El Paso was nothing more than a request for a purely lateral transfer. The Court has held  that a denial of a

transfer request to an identical position at a different job site was not an ultimate employment decision. *Hernandez v. Crawford Bldg. Material Co.,* 321 F.3d 528, 531-32, n.2 (5th Cir. 2003).

Furthermore, in neither the denial of the transfer or the termination can Plaintiff show that other similarly situated employees, not of Plaintiff's protected class, were treated more favorably. Plaintiff has no evidence that other employees were similarly situated or that they received preferential treatment. (Plaintiff's Depo. pp. 108-110). Chief Barker stated that the situation was handled in the same way that he handled similar situations in the past involving other employees.

To establish discrimination, Plaintiff must demonstrate that employees who received better treatment were "similarly situated in all respects." *Smith v. Monsanto Chemical Co.*, 770 F.2d 719, 723 (8th Cir.1985). Plaintiff offers no competent summary judgment evidence to support his allegations that other employees, not of his protected class, were similarly situated. The conduct at issue is not nearly identical when the difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer. *See Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296, 304-05 (5th Cir. 2000)(requiring the plaintiff to show that the company treated others differently in "nearly identical circumstances" and finding that "the striking differences between the two men's situations more than account for the different treatment they received"); *see also Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)("In other words, they must have dealt with the <u>same</u> supervisor, have been subject to the <u>same</u> standards[,] and have engaged in the <u>same</u> conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the [Agency's] treatment of them for it.").

Plaintiff cannot establish a *prima facie* case of discrimination and his claims should be dismissed.

**D.**     **Plaintiff Cannot Establish a *Prima Facie* Case of Retaliation.**

Title VII makes it an "unlawful employment practice for an employer to discriminate against any of his employees...because he has opposed any practice made an unlawful employment practice by this subchapter..." 42 U.S.C. § 2000e-3(a). To establish a *prima facie* case of retaliation, the plaintiff must show that:  (1) he engaged in an activity protected by Title VII, (2) an adverse employment action occurred, and (3) there is a causal connection between the participation in the protected activity and the adverse action.  *Mato v. Baldauf*, 267 F.3d 444 (5th Cir. 2001).  The Court, in *Burlington N. & Santa Fe Ry. Co. v. White*, ___ U.S. ___, 126 S. Ct. 2405 (2006), held "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2415 (*quoting Washington v. Illinois Dept. of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005)).  The Court emphasized that such adversity must be material as the statute does not protect employees from "those petty slights or minor annoyances that often take place at work." *Id.*  The Court also stressed the objective nature of this standard and the necessity of applying its general terms in the context of each case. *Id.*  Moreover, the standard is tied to the challenged retaliatory act and not the underlying discrimination. *Id.* at 2416.

As indicated above, Plaintiff cannot establish an adverse action regarding the denial of transfer, even under the more recent standard set out in *Burlington Northern*.  The Court did not upset established precedent that held that tangential decisions that might have some effect in the future are not adverse employment decisions. *Sackett v. Gonzales*, 2006 WL 1806139, *5 (E.D. Tex.) *unpublished*. Decisions by an employer that are only tangentially related to an ultimate employment decision are not adverse employment actions.  *Id.*  Lateral transfers, or transfers that do not involve promotion or demotion or change in work responsibilities, have not been considered adverse employment actions.  *Sackett*, 2006

16

WL 1806139, *5, *citing Burger*, 168 F.3d at 879 and *Weber v. Hurtgen*, 297 F. Supp.2d 58, 65-66

(D.D.C. 2003)(applying the same principle to federal employment claims).

Moreover, Plaintiff cannot establish a causal connection between his alleged opposition to

discrimination and the alleged adverse actions. Courts consider the period of time that elapsed between

the last filing of a complaint and the alleged adverse decision. *Evans v. City of Houston*, 246 F.3d 344,

354 (5th Cir. 2001)(lapse in time up to four months has been found sufficient to satisfy the causal

connection for summary judgment purposes); *Nat'l Labor Relations Board v. Brookshire Grocery Co.*,

837 F.2d 1336, 1341 (5th Cir. 1988)(activity six months prior to discharge too attenuated to draw a

connection); *Raggs v. Mississippi Power & Light Co.*, 278 F.3d 463, 471 (5th Cir. 2002) (summary

judgment proper where adverse action occurred five months after protected activity). According to

Plaintiff, he complained to his supervisors Woo and Estep that they provided reasonable

accommodations to White employees but not to him.  (Plaintiff's Depo. P. 53).  He complained about

this a few weeks after his surgery in October of 2001.   The denial of the transfer to El Paso occurred

in 2003.  The termination occurred in 2004.  Therefore, his alleged complaint in 2001 is too attenuated

to establish a causal connection.

Additionally, there is no evidence that Chief Barker, the deciding official, was aware of

Plaintiff's prior activity. *See Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 n. 9 (4th Cir.

1985); *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 656 (4th Cir. 1988).

Plaintiff failed to establish a *prima facie* case of retaliation.

## IV. ALTERNATIVELY, DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT.

Assuming *arguendo* that Plaintiff can establish a *prima facie* case of discrimination or

retaliation, the Agency has articulated legitimate, nondiscriminatory reasons for its decisions. Defendant

does not have the burden of persuasion but only production of evidence supporting a reason for the non-

selection.  *Chapman v. AI Transport* , 229 F.3d 1012, 1024 (11th Cir. 2000).  Whether an employer

satisfies its burden of persuasion involves no credibility assessment; a court is to take the employer's

rebuttal evidence as true.  *St. Mary's Honor Center*, 509 U.S. at 509.

Plaintiff's initial injury was in May, 2001.  He returned from this injury in April 2002.

However, Plaintiff injured himself again less than a month later in May, 2002 during a climb up

Hillsboro Peak.  By June, 2002, his doctor notified the Agency that Plaintiff was permanently restricted

from climbing mountains and towers. Plaintiff testified that the towers are 60 feet tall and that some of

the mountains are in remote areas.   The OWCP scheduled a second opinion with Dr. Pollet.  He did not

assess any permanent restrictions but recommended a weight loss program.  Because of the conflicting

views between the Plaintiff's treating physician and the second opinion physician, OWCP scheduled an

independent medical examination with Dr. Arredondo.  Dr. Arredondo agreed with Plaintiff's treating

physician and assessed permanent restrictions of climbing towers and mountains.  More importantly,

he indicated "it will be a danger to Plaintiff or to others" to allow him to continue to climb towers or

hike mountains. These were essential functions of the duties of an electronic technician.

The Agency had no permanent light duty positions available in the Electronic Branch. In

addition, the permanent restrictions placed upon Plaintiff by his physician limited the Agency's ability

to offer him work of any kind as an Electronics Technician.(*Exhibit 27, Statement by Chief Barker*)  The

Agency did a job qualification analysis to determine what position Plaintiff was qualified for. The only

position available was the LECA position.

According to Chief Barker, the Agency offered Plaintiff the position on three occasions because

the Agency wanted to make sure that Plaintiff would have the opportunity to remain gainfully employed.

The situation was handled in the same way that they handled similar situations in the past involving

other employees. Joe Maurer testified that it was a heavy burden for Chief Barker to make the decision

18

to terminate Plaintiff because in the course of 2-3 years the Agency had attempted to assist Plaintiff. (*Exhibit 34: Deposition of Joseph Maurer, pp.126-127*).

Plaintiff cannot  show that the Agency's explanation is not the true reason, but is instead a pretext for illegal discrimination. *St. Mary's Honor Center*, 509 U.S. at 507.  At all times, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains with the plaintiff. *Johnson v. Louisiana*, 351 F.3d 616, 621 (5th Cir. 2003).

Moreover, he cannot show that the Agency retaliated against him.  Unlike a disparate treatment case, which requires that the prohibited factors be a substantial motive, the ultimate determination in an unlawful retaliation case is whether the conduct protected by Title VII was a "but for" case. *Long v. Eastfield College*, 88 F.3d 300, 305 n. 4 (5th Cir. 1996).  Thus, the employee must show that the employer's explanation is unworthy of credence and that "but for" his protected activities he would not have suffered the adverse employment action. *Rios v. Rossotti*, 252 F.3d 375, 380 (5th Cir. 2001); *Price v. Federal Express Corp.*, 283 F.3d 715 (5th Cir. 2002)  (in the third stage of the burden-shifting framework, the plaintiff is given an opportunity to prove the defendant's proffered reason is not true, but instead a pretext for intentional discrimination)  Even a weak inference of pretext is not enough to create a genuine issue of fact. *Rios*, 252 F.3d at 381.   As indicated above, Plaintiff cannot establish that the Agency's reasons were a pretext for retaliation.

## V. PLAINTIFF IS NOT ENTITLED TO A JURY TRIAL, COMPENSATORY DAMAGES, OR ATTORNEY'S FEES FOR HIS CLAIMS PURSUANT TO THE ADEA.

Plaintiff's demand for a jury trial for claims under the ADEA is barred by the principle of sovereign immunity. The ADEA does not expressly grant a right to a jury trial. In *Lehman*, the Supreme Court held that because Congress had not affirmatively and unambiguously granted by statute a right to a jury trial in ADEA actions against the federal government, the government's sovereign immunity barred such actions being tried by a jury. *Lehman v. Nakshian*, 453 U.S. 156, 168-69 (1981).  *See also*

*Haimovitz v. U. S. Depart. of Justice*, 720 F. Supp. 516, 524 n.1 (W.D. Pa. 1989), *aff'd without op.*, 902 F.2d 1560 (3d. Cir. 1990); *Arnett v. Aspin*, 846 F. Supp. 1234, 1241 (E.D. Pa. 1994)(plaintiffs suing federal government under ADEA do not have right to jury trial). Thus, Plaintiff's demand for a jury trial for his ADEA claims should be stricken by this Court.

Plaintiff is not entitled to compensatory damages for his claims under the ADEA "[T]he Courts of Appeal have unanimously held...that the ADEA does not permit a separate recovery of compensatory damages for pain and suffering or emotional distress." *Villescas v. Abraham*, 311 F.3d 1253, 1259 (10th Cir. 2002); *see also, Sozio v. Dallas County Community College District*, 1999 WL 305239, *1 (N.D. Tex. 1999) (it is well settled that the ADEA does not permit a separate recovery of compensatory damages for pain and suffering or mental and emotional distress). *See also, Smith v. Office of Personnel Management*, 778 F.2d 258, 263 (5th Cir. 1985)(no liquidated damages under the ADEA for public sector employees). Additionally, Congress has not provided for the award of attorney's fees in cases brought pursuant to the ADEA. *Boehms v. Crowell*, 139 F.3d 452, 461 (5th Cir 1998) ("we now hold that ADEA subsection 633a(c) may not be used to award attorney's fees against the federal government"). Any demand for attorney's fees pursuant to the ADEA should be dismissed.

WHEREFORE, PREMISES CONSIDERED, Defendant Alberto R. Gonzales, Attorney General, United States Department of Justice, respectfully prays that this Motion To Dismiss, or, In the Alternative, Motion for Summary Judgment be granted and that this cause be dismissed and that Defendant be awarded costs, and all other relief to which he may be justly entitled, either in equity or in law.

Respectfully submitted,

JOHNNY SUTTON
United States Attorney

Dated: November 3, 2006.

MAGDALENA G. JARA
Assistant United States Attorney
Texas State Bar No. 10573100
700 E. San Antonio, Ste. 200
El Paso, Texas  79901
Office (915) 534-6884
Facsimile (915) 534-6861

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Civil Procedure 5, I certify that a true and exact copy of the foregoing was served upon all parties of record this 3rd day of November, 2006, and deposited same

Via U.S., first-class postage-prepaid          _____

Via U.S., certified mail                         ___X_____

Via facsimile                                    _____

Via hand delivery                               _____

THE LAW OFFICE OF
FRANCISCO X. DOMINGUEZ
521 Texas Ave.
El Paso, TX 79901

MAGDALENA G. JARA
Assistant United States Attorney

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **FRANK G. SILVA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **EP-05-CA-0443-FM** |
| | § | |
| **MICHAEL CHERTOFF,** | § | |
| **SECRETARY, DEPARTMENT** | § | |
| **OF HOMELAND SECURITY,** | § | |
| | § | |
| **Defendant.** | § | |

## ADDENDUM - STATEMENT OF FACTS

1.  On December, 1999, Plaintiff was employed as an Electronic Technician for the United States Border Patrol, El Paso Sector, stationed in Las Cruces, New Mexico.[1]   The Las Cruces Shop consisted of Jerry Estep, Supervisor Electronic Technician, John Page, Electronic Technician, and Plaintiff. (*Exhibit 2, Plaintiff's Deposition, p. 9, lines 6-17*).

2.  The duties of an Electronic Technician include installing electronic devices on the mountain ranges. The electronic device is a sensor repeater, that is positioned on mountain top ranges, that sends signals to Border Patrol Station to identify the position of undocumented aliens. *(Exhibit 3: Position Description).*   An electronic technician must hike to remote mountaintops, in order to diagnose, repair, or replace defective sensor equipment. The electrician technician must climb towers to diagnose, repair, or replace antenna equipment. (*Exhibit 2, p. 16, lines 2-22*). Plaintiff was familiar with the requirements of the position description. (*Exhibit 2, p. 14, lines 1-7*).

3.  On or about April 19, 2001, Plaintiff, his co-worker, John Page, and his First Line Supervisor, Jerry Estep, traveled to Gillespie Peak to plant sensors on the mountain top. Gillespie Peak is 10,000 feet in elevation. During the trip up the hill, Plaintiff began to experience leg cramps and slowed down. He stopped and did not arrive at the mountaintop. Page, after arriving at the mountaintop, returned down to retrieve Plaintiff's backpack. After Estep and Page planted the sensor, they met Plaintiff and the three began to walk down the hill to the vehicle. It became dark and because there were no clear cut trails, they spent the night. At daybreak, they walked down approximately another 3 hours to their vehicle.

---

[1]In 2002, the United States Border Patrol became a part of the Department of Homeland Security-Customs and Border Protection. For purposes of this motion, the Agency will be referred to as Border Patrol.

Plaintiff did not file a workers' compensation claim at this time. (*Exhibit 27*,Excerpts from ROI).

4.   On July 16, 2001, Plaintiff filed a worker's compensation claim as result of the alleged injuries he sustained during the Gillespie climb. *(Exhibit 4)*. This was the first time he had notified his supervisor, Estep, of an alleged injury. (*Exhibit 2, p. 83, lines 5-10; Exhibit 5*).

5.   On July 24, 2001, he returned to work with restrictions of no climbing towers or mountains. He was placed on "light duty" assignment until September 1, 2001.  (*Exhibit 1: excerpts from the Office of the Worker's Compensation Program ["OWCP"]²,  pp. 10 & 31*). The light duty assignment was extended until November, 2001. However, on October, 8, 2001 Plaintiff underwent arthroscopy of the right knee and was off work. (*Exhibit 1, pp. 24, 33-34*).

6.   On April 22, 2002, Plaintiff returned to work on regular duty with no restrictions. *(Exhibit 1, p. 135)*.

7.   On May 9, 2002, Plaintiff alleged he had re-injured his knee.  Plaintiff, Estep and another employee, went to install a new sensor repeat for the Truth or Consequences, New Mexico at the Hillsboro Peak.  After one hour of walking on a Forest service trail, Plaintiff indicated he could no longer carry his pack.  Border Patrol Agent Jeff Jones from TCN carried the pack.  Breaks were taken every 15 to 20 minutes.  Plaintiff stated that his legs were hurting and he could not continue and he was going back to the truck area.  (*Exhibit 6)*.

8.   On May 15, 2002, Estep asked Plaintiff what the agency could do to accommodate his inability to do his work.  Plaintiff indicated that he should have been allowed to take a helicopter instead of having to walk.  (*Exhibit 7)*.

9.   On May 15, 2002, Plaintiff filed a second Office of Workers Compensation Form for the incident on May 9, 2002. (*Exhibit 8*).  His doctor's record dated May 15, 2002, indicated that Plaintiff was restricted from working and could not climb mountains or towers. (*Exhibit 1, pp. 6-7*).

10.  After the OWCP claim filed on May 15, 2002, Plaintiff did not return to work.  (*Exhibit 1, p. 262*).

11.  On May 28, 2002, Plaintiff's treating physician noted that Plaintiff was able to return to with permanent  restrictions consisting of walking for no more than 2 hours; lifting limit of 50 pounds for no more than two hours, limit kneeling and squatting; no climbing of mountains or towers, stairs, ladders or scaffolding. (*Exhibit 1,  pp. 142 & 144*).

---

²Exhibit 1, OWCP excerpts are submitted under seal.

12.    Via correspondence dated June 20, 2002, CPA Barker advised Plaintiff that the Agency did not have permanent light duty. He stated that the Agency conducted a qualification review of Plaintiff's experience against vacant positions taking into consideration his physical limitations. Based on the job analysis, the Agency found that the only position available was that of Law Enforcement Communications Officer (LECA). The LECA position was a GS 1802-5 with a noncompetitive promotional potential to the GS-8 level. (*Exhibit 9*).

13.    On July 23, 2002, Plaintiff declined the LECA position. (*Exhibit 9*). He submitted his treating physician's report adding restrictions consisting of sitting for 3 hours/8 hour shift. The treating physician further restricted Plaintiff from working from July 14, 2002, until further notice. (*Exhibit 1, pp. 159, 174-177, 181-182, & 195*).

14.    On September 3, 2002, Plaintiff's treating physician notified the Agency that Plaintiff could return to work with permanent restrictions consisting of: Sitting 2 hours; Walking 6 hours; Standing 6 hours; Squatting 1 hour; and no climbing of mountains/towers. Dr. Westbrook noted that Plaintiff can do bench work where he can stand and move around occasionally. (*Exhibit 1, p. 205*).

15.    OWCP scheduled an evaluation for a second opinion with Randy J. Pollet, M.D. Dr. Pollet opined that Plaintiff could return to unrestricted work but recommended a walking and weight loss program. (*Exhibit 1, pp. 223-218*).

16.    On November 5, 2002, the Agency again offered Plaintiff the LECA position because BP Sector does not have permanent light duty work. The agency conducted a qualification review on his experience against vacant positions and his physical limitations. (*Exhibit 10*).

17.    On November 19, 2002, Plaintiff declined the second job offer with attending physician's report adding restrictions consisting of: No work until further notice. (*Exhibit 11*).

18.    On January 3, 2003, the Agency requested medical information pertaining to placement in LECA position and informed Plaintiff that the Agency could accommodate him in the LECA position through the use of a monitor & keyboard that could be adjusted to allow for use while standing or sitting; headphones with 12 foot extension which allows for freedom of movement. (*Exhibit 12*).

19.    On March 12, 2003, Dr. Arredondo performed the IME. He opined that Plaintiff could work and perform eight hours of work per workday under permanent restrictions of no climbing, no squatting for more than four hours, no walking for more than six hours, and additional restrictions placed on the amount of weight involved in using the leg to push, pull or lift. These restrictions still prevented Plaintiff from being able to perform the physical requirements of an Electronics Technician Position. (*Exhibit 1, pp. 287-277*).

20.   On May 7, 2003, Plaintiff met with ACPA Montoya, Woo, Don Oliver regarding his restrictions. (*Exhibit 13*).

21.   June 6, 2003 Letter from OWCP requesting that the agency offer job based on results of IME consistent with restrictions imposed by Dr. Arredondo. (*Exhibit 1, p. 290*).

22.   On June 20, 2003, the Agency offered the LECA position for the third time. The agency further outlined accommodations to the work console and accommodations to the medical needs stated in the IME. (*Exhibit 14*).

23.   Plaintiff confirmed that he was told by the OWCP that even if Border Patrol could not provide the modifications for the LECA position, that OWCP would provide the modifications by raising the consoles; that Dr. Arredondo had released him to work for the LECA position; that the Agency was willing to modify the work area so that Plaintiff could alternative between standing and sitting. (*Exhibit 2, p. 46 and Exhibit 1, p. 339-335*).

24.   According to Chief Barker, the Agency denied Plaintiff's request for permanent light duty because there is no permanent light duty position available in the Electronic Branch. In addition, the restrictions placed upon him by his physician limited the Agency's ability to offer him work of any kind as an Electronics Technician because Plaintiff's treating physician placed the restrictions permanently. The Agency offered the position on three occasions because they wanted to make sure that Plaintiff would have the opportunity to remain gainfully employed. The situation was handled in the same way that I would have handled similar situations in the past involving other employees. (Exhibit 27, ROI-. Baker's statement).

25.   Third job offer declined on June 30, 2003. *(Exhibit 15)*.

26.   On July 10, 2003, Plaintiff told BP that he wanted his job search restricted to only the El Paso Border Patrol sector because he did not want to be transferred to another duty location outside of El Paso *(Exhibit 2, p. 101, lines, 5-21) and Exhibit 16)*.

27.   Correspondence to Plaintiff advising of key issues about job offered and its current availability July 10, 2003, with accommodation of the work station that would allow Plaintiff to sit or stand at his discretion. The difference between the LECA and his previous position would be coordinated with OWCP. (*Exhibit 17*).

28.   On July 15, 2003, the Agency received Plaintiff's treating physician's report notifying the agency that Plaintiff was able to return to work with permanent restriction consisting of climbing, no more than 4 hours a day. (*Exhibit 18*).

4

29. On July 24, 2003, OWCP informed Plaintiff that they had reviewed the job offer at the LECA position and found it suitable in accordance with Plaintiff's medical limitations provided by Dr. Arredondo and they would make up the pay difference between the LECA position and current pay of Plaintiff's position on the date of the injury. *(Exhibit 1, p. 341)*. This offer met the restrictions of the physician who performed the second opinion and the referee; DOL would also provide modifications to the work station if medically prescribed. *(Exhibit 1, p. 339)*.

30. On August 25, 2003, OWCP sent correspondence to Plaintiff indicating that Plaintiff had not provided valid reason for refusing LECA position and his benefits would terminate for failure to accept a valid position. *(Exhibit 1, 350)*.

31. The OWCP accepted Plaintiff's claim for benefits under workers' compensation. He received benefits, including continuation of pay, as follows: 10/7/01 to 4/20/02, $2,881.88 and from July 14, 2002 to October 5, 2003, he received $2,561.64. *(Exhibit 27, Plaintiff's Statement)*.

32. Plaintiff testified that he had no information whether the conditions or the request for reasonable accommodation of the individuals he had identified as being similarly situated. *(Exhibit 2, pp 109-111)*.

33. On August 28, 2003, Michael Moon, Deputy, issued a Proposal to remove based on Plaintiff's inability to perform the full range of duties as a result of a medical condition. *(Exhibit 19)*.

34. On September 8, 2003, Plaintiff requested the option of filing for disability retirement. *(Exhibit 20)*.

35. Oral response - CPA advised Frank Silva that he would hold removal in abeyance to afford Mr. Silva the opportunity to file for disability retirement in a timely manner, September 24, 2003. *(Exhibit 21)*.

36. On October 3, 2003, Plaintiff applied for disability retirement and for disability benefits under the Social Security Administration. In the "Applicant's Statement of Disability," Plaintiff stated that he could not perform the duties of his job because "strainious [sic] or vigorous physical activity causes severe pain and swelling of anterior and posterior knee with cramping of lower leg and back spasms." Plaintiff indicated that the Agency had offered him a job sitting on a console with an eight foot cord on headset but his knee still got swollen. At the same time, Plaintiff applied with the Social Security Administration for disability benefits. *(Exhibit 22)*. Plaintiff failed to bring in physician's statement as required to process the application for disability retirement.

37.   On September 25, 2003, OWCP sent Plaintiff letter advising him his workers compensation benefits would be terminated as of 10/10/03, because he had declined the LECA position. (*Exhibit 1, pp. 364-360*).

38.   On October 15, 2003, the OWCP reissued a letter to Plaintiff advising him his benefits under the Federal Employees' Compensation Act (FECA) would be terminated effective November 2, 2003 as a result of his refusal to accept suitable work which had been offered by BP. (*Exhibit 1, pp. 374-371*).

39.   On October 29, 2003, Agency forwarded correspondence to Plaintiff requesting needed medical documentation to process disability retirement. (*Exhibit 23*).

40.   November 24, 2003 through January 5, 2004: Maurer had various conversations requesting needed medical documentation and emphasizing Frank Silva's responsibility to provide it. (*Exhibit 24*).

41.   A December 2, 2003, medical entry indicated Plaintiff was diagnosed with tear, medial meniscus, knee, current, internal derangement of the knee, NOS, osteoarthrosis NOS, Lower leg. The doctor noted, "he may not return to climbing towers or doing the activities that he was doing as an electronics technician at the Border Patrol." (*Exhibit 1, p. 402*).

42.   On January 5, 2004, Agency forwarded letter to Plaintiff requesting needed medical documentation to process disability retirement and advising him that noncompliance may result in the Agency moving forward with the removal action currently being held in abeyance. (*Exhibit 25*).

43.   On February 20, 2004, CPA Barker issued a decision determining that Plaintiff's removal was warranted due to his inability to perform as a result of a medical condition. Plaintiff's removal was effective February 21, 2004. (*Exhibit 26*).

44.   On July 3, 2003, Plaintiff filed a complaint of discrimination because of his race, national origin, and age, physical disability (or perceived disability), and reprisal when, on March 3, 2003, the Agency informed Plaintiff that his request for a transfer to a light duty position in the Electronics Branch, El Paso Station, was denied. He stated" I believe that I am being discriminated against because of the repeated and ongoing refusal to grant me a transfer to the electronics branch in El Paso, Station1. My request came as part of a request for a reasonable accommodation from a disability sustained, a work related injury. There is light duty work available for me at the electronics branch, and because of that my request for transfer was initially granted. However, my supervisor Jerry Estep, white, intervened and went out of his way to ensure that the transfer request was ultimately denied. (*Exhibit 27: excerpts from ROI*),

45.    The Accepted Issue, for complaint number I-03-C143, was that Plaintiff had been discriminated against on the bases of reprisal (prior EEO activity), age (52), race (Mestizo/non-White), national origin (Mexican-American), and disability (Physical).[3] On March 3, 2003, you were informed that your request for a transfer to a light duty position in the Electronics Branch, El Paso Station, was denied. (*Exhibit 27*).

46.    The ACD-EEO Specialist that handles the Central Region reasonable accommodation program, the LR Specialist handing the Plaintiff's reasonable accommodation request and management were scheduled to hold a conference call meeting with the Plaintiff as part of the reasonable accommodation process and to discuss Plaintiff's options. During the teleconference, the Plaintiff stated that his physician had cleared him to climb (this was the restriction that prevented management from returning Plaintiff to his original position). The LMR specialist asked for written confirmation from the physician of his capability. The Plaintiff stated that he would contact the physician and obtain the necessary documents. After the telephone conference, the Plaintiff contacted the EEO counselor and admitted that he lied during the meeting to get out of the room. (*Exhibit 27*)

47.    On April 7, 2004, Plaintiff filed a second informal complaint indicating that he was discriminated against on the bases of national origin, physical disability (sprained knee and leg and medial meniscus), and, reprisal for filing the complaint of discrimination on July 3, 2003 when he was terminated from his position as Electronics Technician because of his inability to perform the full range of duties as a result of a medical condition, effective February 21, 2004. (*Exhibit 28: Excerpts from Supplemental ROI*).

48.    The Administrative Law Judge dismissed Plaintiff's complaint. She found that the denial of reasonable accommodation was inextricably intertwined with the complaint of removal. As such, she found that the EEOC did not have jurisdiction over this "mixed case." She ordered both complaints remanded and processed as a mixed-case complaint under the Merit Systems Protection Board. She further ordered the Agency to issue a Final Agency Decision on the merits of the termination mixed case complaint pursuant to 29 C.F.R. § 16164.302(d). (*Exhibit 29*).

49.    On October 4, 2005, the Agency issued a Final Agency Decision finding no discrimination. (*Exhibit 30*).

50.    Plaintiff applied for pension with the VA based on his claim of unemployability. (*Exhibit 31 and Exhibit 2, p. 62, lines 4-6*).

---

[3]Plaintiff also alleged that on July 1, 2003, he was told that if he did not return to work that his workers' compensation benefits would be terminated and he would lose his job. That allegation was dismissed because Plaintiff failed to state a claim in accordance with 29 C.F.R. 1614.107(a)(1). Plaintiff did not include that issue in the original complaint.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | | |
|---|---|---|
| **FRANK G. SILVA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **EP-05-CA-0443-FM** |
| | § | |
| **MICHAEL CHERTOFF,** | § | |
| **SECRETARY, DEPARTMENT** | § | |
| **OF HOMELAND SECURITY,** | § | |
| | § | |
| **Defendant.** | § | |

## EXHIBITS

Exhibit 1:    Excepts from the OWCP File
Exhibit 2:    Plaintiff's Deposition
Exhibit 3:    Position Description
Exhibit 4:    July 16, 2001 Worker's Comp. Claim
Exhibit 5:    July 16, 2001 Memorandum from Jerry Estep
Exhibit 6:    Emails
Exhibit 7:    May 15, 2002 Memorandum from Jerry Estep
Exhibit 8:    May 9, 2002 Second Worker's Comp. Claim
Exhibit 9:    June 20, 2002 Letter from Barker
Exhibit 10:   November 5, 2002 Letter from Barker
Exhibit 11:   November 19, 2002 Declination of second job offer; and restrictions of no work
Exhibit 12:   January 3, 2003 Letter from Barker
Exhibit 13:   May 7, 2003 Meeting
Exhibit 14:   June 20, 2003 Letter from Barker
Exhibit 15:   Third job offer declined on June 30, 2003
Exhibit 16:   July 10, 2003 job search restriction
Exhibit 17:   July 10, 2003 Letter from Moon
Exhibit 18:   July 15, 2003 Return to School or Work
Exhibit 19:   August 28, 2003 Letter from Moon
Exhibit 20:   September 8, 2003 Request to file for disability
Exhibit 21:   Oral Presentation of Plaintiff
Exhibit 22:   Applicant's Statement of Disability/Social Security
Exhibit 23:   October 29, 2003 Letters from Barker
Exhibit 24:   November 24, 2003 through January 5, 2004 Maurer Notes and February 4, 2004
              Memorandum from J. Maurer
Exhibit 25:   January 5, 2004 Letter from Montoya
Exhibit 26:   February 20, 2004 Letter from Barker

Exhibit 27:    Excerpts from ROI
Exhibit 28:    Excerpts from Supplemental ROI
Exhibit 29:    May 4, 2004 Order of Dismissal
Exhibit 30:    October 4, 2005 Agency Final Decision
Exhibit 31:    Excerpts from VA file
Exhibit 32:    Plaintiff's Answers to Interrogatories
Exhibit 33:    Declaration of Joseph A. Maurer
Exhibit 34:    Deposition of Joseph Maurer